Filed 7/13/11 by Clerk of Supreme Court

IN THE SUPREME COURT

STATE OF NORTH DAKOTA

2011 ND 139

State of North Dakota, Plaintiff and Appellee

v.

Joshua David Stroh, Defendant and Appellant

No. 20100157

Appeal from the District Court of Cass County, East Central Judicial District, the Honorable Steven L. Marquart, Judge.

AFFIRMED.

Opinion of the Court by Kapsner, Justice.

Tristan Jones Van de Streek, Assistant State’s Attorney, P.O. Box 2806, Fargo, N.D. 58108-2806, for plaintiff and appellee.

Jesse Nathan Lange, P.O. Box 1817, Fargo, N.D. 58107-1817, for defendant and appellant.

State v. Stroh

No. 20100157

Kapsner, Justice.

[¶1] Joshua Stroh appeals from a criminal judgment entered after a jury found him guilty of driving under the influence of intoxicating liquor.  Because the district court did not abuse its discretion by deciding that the Intoxilyzer test had been fairly administered and by admitting the test result into evidence, we affirm.  

I

[¶2] 
On September 9, 2009, at 10:37 p.m., a state highway patrol officer observed a vehicle speeding and initiated a stop.  Stroh was identified as the vehicle’s driver, and, noticing an odor of alcohol on Stroh’s breath, the officer administered field sobriety tests.  Stroh failed the field tests and was arrested for driving under the influence.  The officer drove Stroh to the jail, where the officer administered a chemical test on the Intoxilyzer 5000.  The officer conducted the first test at 11:06 p.m., which returned a result of a 0.16 percent blood alcohol level.  Stroh was subsequently charged with driving under the influence.  

[¶3] In April 2010, a jury trial was held in the district court.  During trial, the State offered into evidence the Intoxilyzer test record.  Stroh’s trial counsel objected, arguing the officer had failed to comply with the State Toxicologist’s approved methods for administering the test.  Specifically, Stroh argued that the officer had failed to ascertain the 20-minute waiting period before administering the test, during which time the test subject may not have anything to eat, drink, or smoke.  Over Stroh’s objection, the court received the test record into evidence.  The district court also denied Stroh’s N.D.R.Crim.P. 29 motions for judgment of acquittal after the State rested its case and at the close of evidence.  The jury subsequently returned a verdict of guilty.

II

[¶4] The admissibility of an Intoxilyzer test result is governed by N.D.C.C. § 39-

20-07(5).  
See
 
Steinmeyer v. Dep’t of Transp.
, 2009 ND 126, ¶ 9, 768 N.W.2d 491; 
Buchholtz v. Director, North Dakota Dep’t Transp.
, 2008 ND 53, ¶ 10, 746 N.W.2d 181.  Section 39-20-07(5), N.D.C.C., in relevant part, states:

The results of the chemical analysis must be received in evidence 
when it is shown that the sample was properly obtained and the test was fairly administered
, and if the test is shown to have been performed according to methods and with devices approved by the director of the state crime laboratory or the director’s designee, and by an individual possessing a certificate of qualification to administer the test issued by the director of the state crime laboratory or the director’s designee.

 

(Emphasis added.)

Fair administration of an Intoxilyzer test may be established by proof the State Toxicologist’s approved method for conducting the test has been “scrupulously followed.”  
Steinmeyer
, at ¶ 10.  “However, ‘scrupulous’ compliance does not mean ‘hypertechnical’ compliance.”  
Id.
 (internal quotation omitted).

Under N.D.C.C. § 39-20-07(5), the results of chemical analysis to determine blood alcohol content must be received in evidence if the test sample was properly obtained, and the test was fairly administered and shown to have been performed in accordance with methods and devices approved by the State Toxicologist.  
Henderson v. Director, N.D. Dep’t of Transp.
, 2002 ND 44, ¶ 16, 640 N.W.2d 714.  Absent testimony by the State Toxicologist, a foundational requirement necessary to show fair administration of a breathalyzer test and admissibility of the test results is a showing that the test was administered in accordance with the approved methods filed with the clerk of the district court.  
Ringsaker v. Director, N.D. Dep’t of Transp.
, 1999 ND 127, ¶ 8, 596 N.W.2d 328.  The purpose of N.D.C.C. § 39-20-07 is to ease the requirements for the admissibility of chemical test results while assuring that the test upon which the results are based is fairly administered.  
Lee v. North Dakota Dep’t of Transp.
, 2004 ND 7, ¶ 10, 673 N.W.2d 245. 

 

City of Bismarck v. Bosch
, 2005 ND 12, ¶ 6, 691 N.W.2d 260 (footnote omitted); 
see also
 
State v. Gietzen
, 2010 ND 82, ¶ 7, 786 N.W.2d 1.  

[¶5] Sections 39-20-07(7), (8), and (10), N.D.C.C., are considered statutory exceptions to the hearsay rule.  
State v. Zimmerman
, 516 N.W.2d 638, 641 (N.D. 1994).  Section 39-20-07(7), N.D.C.C., authorizes “the admission of these official records in lieu of the state toxicologist’s testimony describing the methods, devices, and operators” approved under N.D.C.C. § 39-20-07(5).  
Zimmerman
, at 641 (citing 
State v. Jordheim
, 508 N.W.2d 878, 881 (N.D.1993)).  

The defendant may rebut the prosecution’s documentary foundation of fair administration by establishing either a deviation from approved procedures or a lack of fair administration despite compliance.  Once the defendant has successfully rebutted the prosecution’s prima facie showing, the prosecution may present testimony to show fair administration despite defendant’s rebuttal. 

 

State v. Erickson
, 517 N.W.2d 646, 648-49 (N.D. 1994) (citations omitted).  However, “[w]here the prosecution uses both the rule-based (testimony) and statute-based (documents) methods of proving fair administration, the defendant cannot rebut this showing simply by establishing a deviation from approved procedures, if the testimony shows fair administration despite the deviation.”  
Zimmerman
, at 642 n.5. 

[¶6] Thus, “[t]he results of a blood-alcohol test must be received into evidence if the test was fairly administered, and the fair administration of an Intoxilyzer test may be established by showing it was performed according to the State Toxicologist’s Approved Method.”  
State v. Lamb
, 541 N.W.2d 457, 462-63 (N.D. 1996) (citing N.D.C.C. § 39-20-07(5)).  “The admissibility of a test result for alcohol concentration is a preliminary question left to the discretion of the trial court.”  
Lamb
, at 463 (citing 
Erickson
, 517 N.W.2d at 648); 
see also
 
State v. Asbridge
, 555 N.W.2d 571, 573 (N.D. 1996) (“Whether a blood test was fairly administered is a preliminary question of admissibility left to the discretion of the trial judge.”); 
State v. Zink
, 519 N.W.2d 581, 583 (N.D. 1994); 
State v. Vogel
, 467 N.W.2d 86, 91 (N.D. 1991); N.D.R.Ev. 104(a) and 1008.  Once test results have been admitted, the jury may assess their weight.  
Zink
, at 583; 
Erickson
, at 648.  A district court abuses its discretion if the court acts in an arbitrary, unreasonable, or unconscionable manner, or if it misinterprets or misapplies the law.  
See
 
State v. Thompson
, 2010 ND 10, ¶ 10, 777 N.W.2d 617.

III

[¶7] Stroh argues the district court erred by allowing the Intoxilyzer test results as evidence because the State failed to establish fair administration of the test.  Stroh contends the arresting officer’s testimony was impeached at trial.  During cross-

examination, the officer admitted that he had left Stroh alone twice within 20 minutes of the test, the second time being approximately 14 minutes before giving the breath test.  Stroh also asserts the district court acknowledged “there was no constant surveillance of [Stroh] for anything close to 20 minutes.”  Stroh asserts the State did not establish “scrupulous compliance” with the Toxicologist’s approved method for conducting the test because the evidence showed Stroh was handcuffed in front of his body and that Stroh was in possession of a can of chewing tobacco.

[¶8] The State asserts, however, that the district court as fact-finder could reasonably infer that Stroh did not have anything to eat, drink, or smoke during the 20-minute waiting period.  The State contends the court did not abuse its discretion because its decision was the product of a rational mental process and the court found that the 20-minute waiting period was complied with.  The State contends that although there is testimony Stroh possessed a can of chewing tobacco when he was patted down, there is no evidence he consumed the tobacco, even though Stroh testified at trial.

[¶9] Here, the State Toxicologist’s approved method, which the district court received into evidence, states that a test operator “must ascertain that the subject has had nothing to eat, drink, or smoke within twenty minutes prior to the collection of the breath sample by answering the question ‘20 MIN WAIT? Y/N.’”  The officer testified, and the test report also indicates, that the officer had ascertained the 20-

minute waiting period before administering the test.  The district court admitted the test record into evidence, deciding the test had been fairly administered.  This Court does not require “hypertechnical” compliance, but rather “scrupulous” compliance.  We have also said, “‘[O]bserving’ the subject is not the only manner of ‘ascertaining’ that the subject had nothing to eat, drink, or smoke within twenty minutes prior to the collection of the breath sample.”  
Buchholz v. North Dakota Dep’t of Transp.
, 2002 ND 23, ¶ 10, 639 N.W.2d 490.
  Thus, for the Intoxilyzer test result to be admissible under N.D.C.C. § 39-20-07(5), the State must have established “scrupulous compliance” with the approved method, including ascertaining the 20-minute waiting period.

[¶10] 
The officer testified during direct examination that he ascertained the 20-

minute waiting period before administering the test.  The officer provided the following testimony describing the purpose of the 20-minute waiting period:

It’s basically while you’ve observed the person you have in custody to make sure before you administer the test that they hadn’t put chewing tobacco, gum or something in their mouth that might interfere with the test.  You need to keep them in sight until you administer that test.

 

The officer then testified as to what he had done to ascertain the 20-minute waiting period:  

Q. (By Mr. Van de Streek) Now I want to talk more specifically, Trooper, about this particular test that was run on the Defendant and I am going to sort of take you through it step by step.  On that time when you did this test did you ascertain a 20-minute waiting period?

A. Yes.

Q. What did you do to determine that the waiting period had been complied with?

A. I had the subject in my back seat of my patrol car from the time I left the traffic stop until the time I arrived at the jail.  Once I arrived at the jail, I had to initiate—to turn on the machine.  There’s a warmup period between the time the machine is ready to go and the time I can administrate the first test.

Q. Did he have anything in his mouth?

A. No.

Q. Eat, drink or smoke?

A. Not while I was there, no.

Q. Nothing that you observed?

A. Nothing that I observed.

Q. He was handcuffed and in custody during that time?

A. Yes.

Q. Did you use a clean mouthpiece for the test?

A. Yes, both times.

Q. Both for each sample you used a clean mouthpiece?

A. Yes.

Q. It wasn’t a mouthpiece left over from the guy before?

A. No.

Q. Did you use the standard solution that was provided to you there?

A. Yes.

Q. So you bring him into the room, you turn the machine on, what happens next?

A. There’s some information I have to enter—I was going to say scan.  Excuse me.  That’s the old machine.  There’s information I have to enter in regards to who the subject is that I’m doing, my information as far as my operator’s license number, things like that, and what the test is for.

Q. So you get the test ready.  At some point then do you have the Defendant blow into the [I]ntoxilyzer machine?

A. When the machine tells me it’s time for the subject to blow, then yes.

Q. And before that first breath, had you ascertained the waiting period?

A. Yes.

Q. Did he belch or burp or vomit or anything like that?

A. No.

Q. When it came to giving a sample, was he able to give a good, clean sample?

A. Yes, very much so.

Q. Did he cooperate with you during this test?

A. Very much so.

 

The officer therefore unequivocally testified that he had ascertained the 20-minute waiting period before giving the first breath sample; that Stroh did not have anything in his mouth; that he did not observe Stroh eat, drink, or smoke anything; and further that Stroh did not belch, burp, or vomit, and gave a good sample.

[¶11] During trial, however, the video recording of the encounter with Stroh from the officer’s squad car was also admitted into evidence.  Although the officer testified he ascertained the 20-minute waiting period by observing Stroh, Stroh’s counsel on cross-examination established the officer had actually left Stroh unattended in his car at least twice:

BY MR. LANGE:

Q. Officer, we just watched a portion of the video that shows you placing Mr. Stroh under arrest, correct?

A. Yes.

Q. And then you asked him if he had anything in his pockets, correct?

A. Yes.

Q. And he said just a can of chew[ing tobacco], right?

A. Yes.

Q. And then you placed him in the back seat of the squad car, correct?

A Yes.

Q. He had his hands in front of him, correct?

A. Yes.

Q. And then it showed you leaving him alone, correct?

A. Yes.

Q. That was before any other officer came to the scene, correct?

A. Yes.

Q. Okay.  And so you—after you returned to the squad car, then you called for another officer to come to the scene, correct?

A. Yes.

Q. Now how many officers were at the scene?

A. Just the one other.

Q. Okay.  So two of you total; is that correct?

A. Yes.

MR. LANGE: Judge, if I—I just want to play maybe a minute or so.

. . . .

(State’s Exhibit 6 was played to the jury.)

MR. LANGE: Judge, I am going to just stop it a couple of times so I can ask a couple questions.

THE COURT: Sure.  Go ahead.

Q. (By Mr. Lange) On the screen you can see that this is 22:49:35 seconds, correct?

A. Yes.

Q. Okay.  And you are shown right here and you’re up at Mr. Stroh’s vehicle, correct?

A. Yes.

(State’s Exhibit 6 was played to the jury.)

Q. Now I’ve just stopped the video at 22:51:03; is that correct?

A. Yep.

Q. And now you just heard you getting out of the vehicle to talk to this other officer, correct?

A. Say that again.

Q. We can hear on the video now you are updating another officer on what’s going on?

A. Yeah, he finally walked up to the side of my car to talk to me.

Q. Okay.  And your testimony is that—where was he before?

A. Behind my car.

Q. Okay.  In his car?

A. No, standing outside of my car.  He knew to do that while I was up at the car.

Q. Okay.  He stood behind the car and then he stayed with Mr. Stroh for the rest of the time, correct?

A. Until I got back into my car and then he came up, we had a conversation—

Q. So one of you was with him the whole time?

A. Right, except for the first time.

MR. LANGE: Okay.  Let’s just watch a little bit further.

(State’s Exhibit 6 was played to the jury.)

Q. (By Mr. Lange) Okay.  Now I’m stopping it again.  We’re at 22:51:28, correct?

A. Yes.

Q. According to this clock we’re, what, 14 minutes from the test, correct?

A. Yes.

Q. And on this point, this frame of the video, you’re up at Mr. Stroh’s car, correct?

A. Yes.

Q. And so is the other officer, correct?

A. Yes.

Q. Okay.  So you did leave him alone within those 20 minutes, correct?

A. Yes.

Q. I think we can probably turn the lights back on.  And so it was at least twice where he was left alone and there was no other officer around, correct?

A. Yes, now that I’ve seen the video.

Q. Okay.  And this one, this is 14 minutes before?

A. Yes.

 

[¶12] Based on the cross-examination, Stroh established the officer had twice left Stroh unattended in the squad car, handcuffed in the front of his body, with the last time being approximately14 minutes before administering the test.  The testimony also indicates that Stroh at some point had a can of chewing tobacco in his pocket.  In deciding whether the officer ascertained the 20-minute waiting period, the district court struggled with whether the State had established scrupulous compliance for admission of the test results and in denying Stroh’s N.D.R.Crim.P. 29 motions.  In reaching its decision that there had been fair administration of the Intoxilyzer test, however, the district court made a number of findings.

[¶13] The district court found that Stroh was in the patrol car more than 20 minutes before the test was taken and that the officer had given his opinion that Stroh did not put anything in his mouth during that period of time, despite “could have” evidence.  The court noted that “constant” surveillance was not required.  Although the evidence indicated Stroh had a can of chewing tobacco in his pocket, there was no evidence of what had happened to the chewing tobacco after the officer found it in Stroh’s pocket.  The officer’s testimony was silent on this point. And even though he testified in his own defense, Stroh provided no testimony on this point.  The court also found there was testimony that there was nothing in the patrol car for Stroh to put in his mouth.  Considering the absence of evidence regarding what happened to the can of chewing tobacco, the court ultimately concluded that once Stroh had been handcuffed and in the squad car for well over 20 minutes, the officer complied with the 20-minute waiting period.  

[¶14] Under these facts and circumstances, we conclude the district court did not abuse its discretion in deciding the State established the officer scrupulously complied with the 20-minute waiting period.  Although Stroh testified at trial, Stroh did not testify that he had in fact put any chewing tobacco in his mouth before the test, or during the periods he was left unattended in the squad car.  The officer, however, testified that he ascertained the 20-minute waiting period and that prior to the test, Stroh did not have anything in his mouth.  This left the inference to be drawn by the district court, which in essence concluded that Stroh had failed to rebut the evidence that the officer ascertained the 20-minute waiting period.

[¶15] Based upon our review of the record, the officer testified that he ascertained the 20-minute waiting period, that Stroh did not have anything in his mouth prior to the administration of the Intoxilyzer test, that the officer did not observe Stroh eat, drink, or smoke during the period of time he observed him, that Stroh was handcuffed and in the squad car for over 20 minutes, and that nothing was in the patrol car for Stroh to put in his mouth.  The only lingering fact the district court had to decide in this case was whether the presence of a can of chewing tobacco discovered when Stroh was patted down, negated the officer’s “scrupulous compliance” with the 20-

minute waiting period; or, put another way, whether in the six minutes before the last time Stroh was left handcuffed and unattended in the patrol car, Stroh had placed chewing tobacco into his mouth.  The officer testified, however, Stroh had nothing in his mouth prior to the test.  Stroh had the opportunity to affirmatively state that he had tobacco in his mouth, but did not so testify.  Thus, the district court, left with no other evidence as to what happened to the can of chewing tobacco, reasonably inferred the officer had ascertained the 20-minute waiting period.  Under these facts and circumstances, we cannot conclude that the district court acted in an arbitrary, capricious, or unreasonable manner, nor that it misinterpreted or misapplied the law.

[¶16] We therefore conclude the district court did not abuse its discretion by deciding that the State established fair administration of the Intoxilyzer test by allowing the Intoxilyzer test results into evidence.

IV

[¶17] We affirm.

[¶18] Carol Ronning Kapsner

Mary Muehlen Maring

Daniel J. Crothers

Dale V. Sandstrom

Gerald W. VandeWalle, C.J.